UNITED STATES DISTRICT COURT
FOR THE DISTRICT OF RHODE ISLAND

GLOCESTER COUNTY CLUB,            :
        Plaintiff,            :
                            :
       v.            :            C.A. No. 20-cv-00184
                            :
SCOTTSDALE INSURANCE COMPANY,            :
        Defendant.            :

**REPORT AND RECOMMENDATION**

PATRICIA A. SULLIVAN, United States Magistrate Judge.

Plaintiff Glocester Country Club ("GCC") is a nine-hole golf club that uses more than thirty pieces of gasoline-powered equipment, including golf carts, for various aspects of its golf business.  DSUF ¶¶ 1, 7, 36; ECF No. 18-1 at 6, 146.[1]  Of these, during the period in issue, nine pieces of equipment were used in connection with GCC's ongoing pesticide and herbicide application operations by GCC's grounds superintendent, Ralph Simonelli.  DSUF ¶¶ 8-9.  GCC stored the gasoline to fuel all of this equipment in an above-ground storage tank located on property it owned.  DSUF ¶¶ 1-2, 7.  At an unknown time and due to an unknown cause, the gasoline tank began to leak, resulting in a dispersal of gasoline that contaminated the soil and groundwater on GCC's property and that of its neighbor.  DSUF ¶ 1-5.  In 2018, the Rhode Island Department of Environmental Management ("RIDEM") investigated and advised GCC of the gasoline leak; in August 2018, RIDEM found GCC responsible to remediate the environmental contamination.  DSUF ¶¶ 10-14.  GCC also agreed to pay the neighbor's claim. DSUF ¶¶ 15-16.

---

[1] Defendant's Statement of Undisputed Facts ("DSUF") is at ECF No. 18-3.  Plaintiff's Statement of Undisputed Facts ("PSUF") is at ECF No. 19-12.

To recover its losses arising from the pollution damage to its own and the neighbor's property, GCC turned to Defendant Scottsdale Insurance Company ("Scottsdale") and made a claim on a commercial general liability insurance policy[2] Scottsdale had issued to GCC's grounds superintendent, Mr. Simonelli, in connection with the pest control services[3] that he performed on GCC's property.  GCC is not the insured; rather, it is listed in the policy as an "additional insured."  DSUF ¶¶ 2, 17, 19, 24, 26.  Scottsdale denied coverage, invoking the "Pollution Exclusion" in ¶ f(1)(a) of the policy; its denial letter also expressed "concern" that there was no coverage because there appeared to have been no "occurrence" pursuant to ¶ 1(b)(1) of the policy.  DSUF ¶ 42.  When GCC pointed to the policy's "Pesticide or Herbicide Applicator Limited Pollution Coverage Endorsement," which is based on ¶ f(1)(d) of the policy ("Pesticide Endorsement" or "¶ f(1)(d) Pesticide Endorsement"), Scottsdale responded that this endorsement is inapplicable because it applies only to ongoing operations arising out of pest control services and the leak did not occur in connection with the performance of such services.  DSUF ¶ 47-48.

This litigation followed.  Each contending that the pertinent material facts are undisputed, the parties' dueling motions for summary judgment have been referred to me for report and recommendation.  For the reasons set forth below, I recommend that Scottsdale's motion (ECF No. 18) be granted in part and denied in part and that GCC's motion (ECF No. 19) be denied.

## I.      BACKGROUND

### A.      Insurance Application

---

[2] Two identical policies are in issue; they cover the period from August 24, 2017, to August 24, 2019.  DSUF ¶¶ 24-25; ECF No. 19-2 at 3-4.  Taking my cue from the parties, I refer only to the second of the two.

[3] It is undisputed that Mr. Simonelli's operations included the application of both pesticide and herbicide and that the applicable insurance endorsement covers both pesticide and herbicide.  In the interest of simplicity, I refer only to pesticide, which is intended generically to mean both.

On August 8, 2016, having procured a license to apply chemicals as GCC's employee in charge of maintaining GCC's greens, Mr. Simonelli applied for the liability insurance that he understood was required by Rhode Island's environmental management regulations.[4]  DSUF ¶¶ 18-23.  On the Exterminators General Liability Application that he signed, Mr. Simonelli described the "operations" as "Pesticide/Herbicide for golf greens" and identified the location of the "operations" as GCC's property.  ECF No. 18-1 at 66.  GCC was identified as the "additional insured."  Id. at 67.  As "general information . . . [f]or all past or present operations[,]" the application asked the applicant to indicate whether he/it has "past, present or discontinued operations involv[ing] storing, treating, discharging, applying, disposing, or transporting of hazardous material . . . (e.g., landfills, wastes, fuel tanks, etc.)."[5]  Id. at 74.  Mr. Simonelli's answer was no.  Id.  The application advised that "the information contained herein shall be the basis of the contract should a policy be issued."  Id. at 67.  In signing the application, Mr. Simonelli "represent[ed] that reasonable inquiry has been made to obtain the answers to questions on this application . . . [and that] the answers are true, correct and complete to the best of his . . . knowledge."  Id. at 70, 75.

   B.   **Pertinent Policy Provisions**

---

[4] The parties dispute whether Rhode Island's regulations required Mr. Simonelli, as an employee, to be the named insured or whether GCC could have procured the policy.  E.g., DSUF ¶ 21; PSUF ¶¶ 35-36.  This dispute is not material.

[5] GCC argues that this portion of the application must be interpreted as falling under the heading "[a]dditional interest/certification recipient" and that it therefore has nothing to do with the "operations" for which Mr. Simonelli was seeking insurance.  ECF No. 25 at 4-5.  A quick look at the application form deflates this contention.  The application has a series of boxes with headings, with each box a separate area of inquiry.  "Additional interest/certification recipient" is the heading of the separate box at the top of the same page on which the "general information" box appears.  ECF No. 18-1 at 74.  It is the "general information" box that inquires whether the "operations" involve any one of twenty-two enumerated potential risk enhancers.  Id. at 74-75.  This inquiry is clearly separate from and not a subset of the box labeled "additional interest/certification recipient."  See Darwin Nat. Assur. Co. v. Matthews & Megna LLC, 36 F. Supp. 3d 636, 643 (D.S.C. 2014) (when interpreting insurance application, courts must give language "its plain, ordinary, and popular meaning") (internal quotation marks omitted).

3

The parties concur that the policy that issued to Mr. Simonelli has several provisions that are in issue in this case.

First, ¶ 1(a-b) of the "Insuring Agreement" provides:

> We will pay those sums that the insured becomes legally obligated to pay as damages because of "bodily injury" or "property damage" to which this insurance applies. . . . only if: . . . [t]he "bodily injury" or "property damage" is caused by an "occurrence" that takes place in the "coverage territory."

ECF No. 18-1 at 90.  "Occurrence" is defined in the "Definitions," ¶ 13, as:

> "Occurrence" means an accident, including continuous or repeated exposure to substantially the same general harmful conditions.

Id. at 104.

There are two exclusions that are in issue.  First is the Pollution Exclusion in ¶ f(1)(a) ("Pollution Exclusion"), which excludes from coverage:

> "Bodily injury" or "property damage" arising out of the actual, alleged or threatened discharge, dispersal, seepage, migration, release or escape of "pollutants": (a) [a]t or from any premises, site or location which is or was at any time owned or occupied by, or rented or loaned to, any insured.

Id. at 92.  "Pollutants" is defined in the "Definitions," ¶ 15, as:

> "Pollutants" mean any solid, liquid, gaseous or thermal irritant or contaminant, including smoke, vapor, soot, fumes, acids, alkalis, chemicals and waste. Waste includes materials to be recycled, reconditioned or reclaimed.

Id. at 104.  The second is another pollution exclusion, this one in ¶ f(1)(d); it excludes from coverage:

> "Bodily injury" or "property damage" arising out of the actual, alleged or threatened discharge, dispersal, seepage, migration, release or escape of "pollutants":  . . .  [a]t or from any premises, site or location on which any insured or any contractors or subcontractors working directly or indirectly on any insured's behalf are performing operations if the "pollutants" are brought on or to the premises, site or location in connection with such operations by such insured, contractor or subcontractor.

Id. at 92.  But for the Pesticide Endorsement summarized *infra*, the ¶ f(1)(d) exclusion would exclude coverage for occurrences at "any" premises at which the insured is "performing operations" due to pollutants brought onto the premises "in connection with such operations."  Id.  "Operations" is not listed as a defined term in the policy's "Definitions."  PSUF ¶ 20.  However, the policy's business description is "Pest Control Services"; the "operations" identified in the supplemental declarations is "Pest Control Services"; and the "Description of Operations" in the "Pesticide Endorsement" is "Pest Control Services."  ECF No. 18-1 at 81, 88, 113.

Finally, there are two endorsements that are in issue.  First, the policy has an "additional insured" endorsement, which provides coverage for GCC, identified as the additional insured in the policy.  This endorsement provides:

> Who is An Insured is amended to include as an individual insured the person(s) or organization(s) shown in the Schedule, but only with respect to liability for "bodily injury", "property damage" or "personal and advertising injury" caused, in whole or in part, by: (1) [y]our acts and omissions; or (2) [t]he acts or omissions of those acting on your behalf; in the performance of your ongoing operations for the additional insured(s) at the locations(s) designated above.

ECF No. 18-1 at 106.  Second, the policy has the Pesticide Endorsement, which is based on ¶ f(1)(d).  This endorsement is described as "limited" and does not add new coverage.  Id. at 113.  Rather, it provides that the ¶ f(1)(d) exclusion does not apply as long as the insured's operations meet applicable standards of law.  Id.

### C.    GCC's Notice of Claim and Scottsdale's Response

GCC's notice of claim describes what it alleges to be the "occurrence":

> 300 gallon above ground tank used for fueling golf carts and lawn maintenance equipment had some form of leakage which was detected on the premises and a third-party residential premises is claiming their well is contaminated.

DSUF ¶ 36 (ECF No. 18-1 at 146).  Following an investigation, the sufficiency of which is hotly disputed, Scottsdale's response was its October 30, 2018, Denial of Coverage letter ("Denial Letter").  ECF No. 18-1 at 151.  In the Denial Letter, Scottsdale relied on the Pollution Exclusion in ¶ f(1)(a) and also expressed "concern" that there is no coverage because there appeared to have been no "occurrence" pursuant to ¶ 1(b)(1) of the policy.[6]  DSUF ¶ 42.  After GCC asked Scottsdale to comment on the policy's ¶ f(1)(d) Pesticide Endorsement, Scottsdale's responsive letter sent on December 13, 2018, stated that the Pesticide Endorsement is inapplicable because it applies only to ongoing operations arising out of pest control services and the leak did not occur in connection with the performance of such services.  DSUF ¶ 44.

## II.     STANDARD OF REVIEW

A court grants summary judgment when the movant "shows that there is no genuine dispute as to any material fact and the movant is entitled to judgment as a matter of law."  Fed. R. Civ. P. 56.  An issue or dispute is considered genuine if the "evidence about the fact is such that a reasonable jury could resolve the point in the favor of the non-moving party."  Sanchez v. Alvarado, 101 F.3d 223, 227 (1st Cir. 1996) (internal quotation marks omitted).  Facts are material if they have "the potential to affect the outcome of the suit under the applicable law."  Id. (internal quotation marks omitted).  The same standard applies when reviewing cross-motions for summary judgment.  The Court must "'consider each motion separately, drawing all inferences in favor of each non-moving party in turn.'"  Green Mountain Realty Corp. v. Leonard, 750 F.3d 30, 38 (1st Cir. 2014) (quoting D & H Therapy Assocs., LLC v. Boston Mut. Life Ins. Co., 640 F.3d 27, 34 (1st Cir. 2013)).

---

[6] The Denial Letter also relied on another exclusion -- ¶ j(1).  ECF No. 18-1 at 155.  Scottsdale did not advance that exclusion in its motion for summary judgment.  It will not be discussed further.

## III.   LAW AND ANALYSIS

In applying the principles of contract interpretation, as they are used when interpreting an insurance policy, if the terms of the policy "are clear and unambiguous, 'the task of judicial construction is at an end and the agreement must be applied as written.'" Atwells Realty Corp. v. Scottsdale Ins. Co., No. PC-2020-04607, 2021 WL 2396584, at *4 (R.I. Super. Ct. June 04, 2021) (quoting Ashley v. Kehew, 992 A.2d 983, 987 (R.I. 2010)); see Bliss Mine Road Condominium Association v. Nationwide Property and Casualty Insurance Co., 11 A.3d 1078, 1083 (R.I. 2010). "To determine whether the policy is ambiguous, we give words their plain, ordinary, and usual meaning." Bliss Mine Road, 11 A.3d at 1083. "The Court considers the policy in its entirety and does not 'establish ambiguity by viewing a word in isolation or by taking a phrase out of context.'" Id. (quoting Amica Mutual Insurance Co. v. Streicker, 583 A.2d 550, 552 (R.I. 1990)). The test to be applied is not what the insurer intended, but what the ordinary reader would understand the words to mean. Pressman v. Aetna Casualty and Surety Co., 574 A.2d 757, 760 (R.I. 1990). "[A]n agreement is ambiguous only when it is reasonably and clearly susceptible to more than one interpretation." McBurney v. Teixeira, 875 A.2d 439, 443 (R.I. 2005) (internal quotation marks omitted). Courts will not indulge in "mental gymnastics . . . to read ambiguity into a policy where none is present." Bliss Mine Road, 11 A.3d at 1083 (internal quotation marks omitted). Ambiguity found in an insurance policy "is strictly construed" against the insurer. Koziol v. Peerless Insurance Co., 41 A.3d 647, 651 (R.I. 2012). Lack of a defined term in an insurance policy is not conclusive of ambiguity; rather, the principles of contract interpretation should be followed, such as looking to the entire policy and giving terms their plain, ordinary, and usual meaning, which may be derived from a dictionary definition. See Bliss Mine Road, 11 A.3d at 1084.

Generally, an insured seeking to establish coverage bears the burden of proving a *prima facie* case, including the existence and validity of a policy, the loss as within the policy coverage, and the insurer's refusal to make payments as required by the terms of the policy.  Ins. Co. of N. Am. v. Kayser-Roth Corp., 770 A.2d 403, 416-17 (R.I. 2001).  The insurer bears the burden of proving the applicability of policy exclusions and limitations in order to avoid an adverse judgment, but only after the insured has sustained its burden and established its *prima facie* case. Id. at 417.  Rhode Island has "acknowledged the general principle favoring broad coverage as the controlling standard."  Jackson v. Quincy Mut. Fire Ins. Co., 159 A.3d 610, 614 (R.I. 2017) (internal quotation marks omitted).  When construing an insurance policy, the court should not apply the policy as written if doing so would render the coverage provided illusory.  Empire Fire & Marine Ins. Cos. v. Citizens Ins. Co. Of Am./Hanover Ins., 43 A.3d 56, 60 (R.I. 2012).

## A.    Applicability of Policy's ¶ f(1)(a) Pollution Exclusion and ¶ f(1)(d) Pesticide Endorsement

Scottsdale's primary basis for denying coverage in its Denial Letter was the Pollution Exclusion at ¶ f(1)(a).  Acknowledging that it bears the burden of proving applicability of this exclusion, Scottsdale argues that the Pollution Exclusion is unambiguous in precluding coverage for property damage arising from the "discharge, dispersal, seepage, migration, release or escape" of a pollutant (gasoline) from the storage tank located on the premises that GCC owned. ECF Nos. 18-1 at 171; 18-2 at 11-12.  It contends that the cause of GCC's loss – leaking gasoline from a tank on GCC's property – falls squarely into this exclusion, as confirmed by a myriad of cases.  E.g., Nascimento v. Preferred Mut. Ins. Co., 513 F.3d 273, 275, 279 (1st Cir. 2008) (affirming grant of summary judgment under Massachusetts law for remediation and other damages arising from oil tank leak; once oil leaks, it becomes "pollutant," and total pollution exclusion in ¶ f(1)(a) of policy is triggered); Guilford Indus. Inc. v. Liberty Mut. Ins. Co., 688 F.

8

Supp. 792, 793-95 (D. Me. 1988), aff'd, 879 F.2d 853 (1st Cir. 1989) (granting summary

judgment under Maine law for state-mandated cleanup and other damages arising from rupture

of oil tank; pollution "exclusion is clear and unambiguous," and "policy language also

demonstrates that the exclusion was meant to apply in situations like this"); Harrison v. R.R.

Morrison & Son, 862 So. 2d 1065, 1072 (La. Ct. App. 2003) (reversing denial of summary

judgment for insurer under Mississippi law for leakage of gasoline from tanks damaging

neighbor's property; ¶ f(1)(a) is not ambiguous and is not open to more than one interpretation).

GCC does not disagree; it has acquiesced to the proposition that the undisputed facts

establish that the Pollution Exclusion in ¶ f(1)(a) is potentially fatal to its claim.  GCC instead

asks the Court to enter summary judgment in its favor based on the Pesticide Endorsement,

which provides coverage for losses circumscribed by the other pollution exclusion in issue – ¶

f(1)(d).  This "limited" endorsement effectively affords coverage for the discharge of pollutants

at "any premises" while the insured is performing "operations" if the pollutants were brought

onto the premises "in connection with such operations" by the insured.  ECF No. 18-1 at 92.

GCC contends that this endorsement applies because the vehicles Mr. Simonelli used for

pesticide application needed gasoline and were fueled (along with all of GCC's other golf carts,

vehicles and equipment) from the leaking gasoline tank.  ECF No. 19-2 at 27-30.  To avoid ¶

f(1)(a), the Pollution Exclusion on which Scottsdale relies, GCC argues that it must be written

out of the policy because it nullifies the coverage created by the Pesticide Endorsement.  That is,

because the Pollution Exclusion bars coverage for pollution spills on premises "owned or

occupied" by GCC, yet Mr. Simonelli's pest control operations were focused on the maintenance

of GCC's greens, which are exclusively located on premises that GCC owns, the Pesticide

Endorsement is rendered illusory – there can never be coverage since pollution spills in

9

connection with the pesticide operations will always occur on premises owned by GCC, which the Pollution Exclusion always bars.  In pressing its position, GCC relies on settled Rhode Island law, which holds that a policy may not be applied as written if doing so would render the coverage entirely or almost entirely illusory.  Empire Fire & Marine Ins. Companies v. Citizens Ins. Co. of Am./Hanover Ins., 43 A.3d 56, 60-61 (R.I. 2012); Employers Mut. Cas. Co. v. Pires, 723 A.2d 295, 299 (R.I. 1999) (per curiam); see Pressman v. Aetna Cas. & Sur. Co., 574 A.2d 757, 759 (R.I. 1990) (applying a "narrow definition of the term 'premises' to the facts of this case . . . renders the power-interruption coverage illusory" because it would "preclude[] coverage in almost any circumstance").

For GCC to prevail on this theory, the ¶ f(1)(d) Pesticide Endorsement must be applicable to GCC's loss.  That is, the Court must find that the leakage of gasoline at an unknown time from the gasoline tank generically used for all of GCC's gasoline-fueled equipment falls within the limited carve-out limned by the Pesticide Endorsement.  The problem for GCC is that this works only if the Court ignores the unambiguous language of the ¶ f(1)(d), which is the foundation for the Pesticide Endorsement.[7]

The starting point of the ¶ f(1)(d) analysis is the meaning of "operations," a term that is used twice in ¶ f(1)(d) to limit the scope of what the "limited" Pesticide Endorsement covers.  Because "operations" is not listed in the policy Definitions, the Court must interpret the term by looking at the entire policy and giving it its plain, ordinary, and usual meaning, which may be derived from a dictionary definition.  See Bliss Mine Road, 11 A.3d at 1084.  This task is not difficult.  The dictionary definition of "operations" is "performance of a practical work or of

---

[7] As noted, the Pesticide Endorsement does not create new insurance coverage; it simply eliminates the coverage exclusion in ¶ f(1)(d).  The Pesticide Endorsement means that any loss covered by the policy but excluded by ¶ f(1)(d) is covered.

something involving the practical application of principles or processes."[8]  The policy itself provides the specifics: the business description in the "Common Policy Declarations" is "Pest Control Services," which the Pesticide Endorsement expressly incorporates into its "Description of Operations"; the "operations" identified in the supplemental declarations is "Pest Control Services"; and the "Description of Operations" stated in the Pesticide Endorsement is "Pest Control Services."  ECF No. 18-1 at 81, 88, 113.  Thus, as used in this policy, the term "operations" is not ambiguous: it is clearly limited to Mr. Simonelli's pest control services and plainly does not extend to the general operations of the golf course for which the leaking gasoline tank was used.

GCC nevertheless argues that the Court must find that the term "operations" as used in ¶ f(1)(d) is ambiguous because Scottsdale's Fed. R. Civ. P. 30(b)(6) witness testified that he did not know what "operations" means.  See PSUF ¶ 21.  However, the record proffered by GCC does not support this proposition.  The witness actually testified that the meaning of "performing operations" is very clear, even though it was not listed as a defined term.  See ECF No. 19-4 at 13.  One of the answers on which GCC relies is the witness' response (following an objection) that he did not know what "performing operations" means "[w]ith respect to this claim."  Id. But his answer was compelled by the question, which asked the witness to focus on "this claim," where "this claim" involved the leak in GCC's all-purpose gasoline tank, not the pest control services identified in the policy, as the witness clarified.  Id. at 13-15.  The other answer (also subject to a well-founded objection) came in response to an off-base imponderable: how fueling a vehicle to apply pesticide[9] "is not part of the operations of applying pesticides?"  Id. at 26.

---

[8] https://Merriam-webster.com/dictionary/operation (last visited August 4, 2021).

[9] The question is off base because the loss in issue did not occur while Mr. Simonelli was "fueling the vehicles that apply the pesticides"; that phrase defined the scope of the question.  ECF Nos. 19-2 at 30 n.9; 19-4 at 25-27.

Neither answer serves GCC's goal in that neither is an admission that "operations" is ambiguous as used in the policy or that "operations" conceivably means something other than Mr. Simonelli's pest control services.  In any event, if one were to hypothesize that the policy is ambiguous with respect to whether the storage of gasoline in a tank generically used by GCC in connection with its golf course operations somehow constitutes the performance of GCC's pest control service operations, such ambiguity would be entirely eliminated by the insurance application that Mr. Simonelli signed.  See Ohio Sec. Ins. Co. v. Truck Tire Sales, Inc., 425 F. Supp. 3d 982, 998-99 (N.D. Ill. 2019) (insurance application is extrinsic to the policy but may be used for interpretation if policy itself has facial ambiguity).  Understanding that Scottsdale would rely on his application and representing that the information he provided was true, Mr. Simonelli described the "operations" as "Pesticide/Herbicide for golf greens" and specified that these "operations" do not involve the storing of hazardous materials, for example, in a "fuel tank[]." ECF No. 18-1 at 66, 74 (emphasis supplied).

The other language in ¶ f(1)(d) that rules out coverage for GCC's loss are the limiting words that specify that ¶ f(1)(d) applies to a pollution spill amounting to an occurrence that happens when the insured and others working on his behalf "are performing operations" and only "if the 'pollutants' are brought on or to the premises . . . in connection with such operations by such insured." ECF No. 18-1 at 92.  Cases interpreting this language focus on the use of the present tense in the phrase "are performing operations" and the addition of the limiting phrase requiring that the pollutants must have been brought onto the premises by the insured "in connection with such operations." See CDC Builders, Inc. v. Amerisure Mut. Ins. Co., No. 10-21678-CIV, 2011 WL 4454937, at *12-13 (S.D. Fla. Aug. 16, 2011) ("reasonable reading of the language suggests that the exception deals with issues associated with [an operation] while a

contractor or subcontractor performs operations . . . based on the use of present tense")
(emphasis added); <u>Scottsdale Ins. Co. v. Am. Safety Indem. Co.</u>, Civil Action No. 10-0445-WS-N, 2010 WL 8624757, at *5 (S.D. Ala. Nov. 10, 2010) (provision in ¶ f.(1)(d) requires that pollutant "must have been brought on or to the site or location in connection with such operations" and, with language "unequivocally [in the] present tense[, a] reasonable interpretation of the plain words found in subsection f.(1)(d)(i) is that the release of pollutants and the insured's performance of operations must occur contemporaneously") (internal quotation marks omitted); <u>Praetorian Specialty Ins. v. PGA Vill. Prop. Owners' Ass'n, Inc.</u>, Case No. 09-14196-CIV, 2010 WL 11602464, at *2 (S.D. Fla. June 23, 2010) (where insured was actively applying herbicide at golf course when it discharged pollutant into lakes, "[t]his clearly falls within the language of subsection (d) of the pollution exclusion").

In this case, the undisputed facts establish that the pollution discharge resulting in GCC's loss was caused by the leakage at an unknown time and due to an unknown cause from GCC's all-purpose gasoline storage tank that it used in connection with its golf business.  This pollution discharge did not occur contemporaneously with Mr. Simonelli's performance of his pest control service operations.  Nor was GCC's loss due to a discharge of gasoline brought by Mr. Simonelli to the premises on which the leak occurred "in connection with" Mr. Simonelli's performance of pest control service operations.  Therefore, GCC's loss simply does not fall into the plain words used in ¶ f(1)(d), which define the scope of the Pesticide Endorsement.

This ends the Court's work.  The Pollution Exclusion in ¶ f(1)(a) is clear and bars coverage for environmental contamination caused by a pollution discharge that occurs on premises owned or occupied by GCC.  It therefore precludes coverage for the third-party liability losses in this case, which undisputedly were caused by the discharge of a pollutant – gasoline –

from the all-purpose storage tank located on GCC premises. Further, the policy's Pesticide Endorsement is limited by the unambiguous words used in ¶ f(1)(d), which stipulate that it applies only to losses that occurred while Mr. Simonelli's pest control services operations were being performed <u>and</u> the discharged pollutant was brought to the premises where it leaked by Mr. Simonelli (or other working with him) specifically in connection with those pest control operations. ECF No 18-1 at 92. The undisputed facts are clear that neither of these predicates are present – the gasoline discharge did not occur while Mr. Simonelli was applying pesticide nor had the discharged gasoline been brought to the premises where it leaked in connection with the pesticide operation. Rather, it is undisputed that the gasoline had been brought to and placed in the leaking tank in connection with GCC's golf course operations; there is simply no evidence to suggest that the discharge occurred, for example, during Mr. Simonelli's fueling of equipment for the purpose of applying pesticide. Therefore, summary judgment must enter in favor of Scottsdale, while GCC's cross motion for summary judgment must be denied. There is no need for the Court to struggle with GCC's contention that the ¶ f(1)(a) Pollution Exclusion renders the ¶ f(1)(d) Pesticide Endorsement illusory. With the ¶ f(1)(d) Pesticide Endorsement clearly not implicated by what happened in this case, without regard to who owns or occupies the premises where the pollutant was discharged, GCC's nullification argument does not affect the outcome.

Based on the foregoing, I find that GCC's claim is precluded by the unambiguous language of the Pollution Exclusion in ¶ f(1)(a), that it does not fall within the plain language of the Pesticide Endorsement based on the ¶ f(1)(d) exclusion, and that there is nothing about these findings that renders the policy illusory or that nullifies its terms. Therefore, I recommend that the Court enter judgment in favor of Scottsdale based on the Pollution Exclusion and against GCC.

**B.    Denial Letter and <u>Optical Works & Logistics, LLC v. Sentinel Ins. Co., Ltd.</u>, Case No. 15-163-JJM-LDA, 2021 WL 928275 (D.R.I. Mar. 11, 2021)**

Apart from the ¶ f(1)(a) Pollution Exclusion, Scottsdale asserts two alternative reasons why the Court should enter judgment in its favor.  First, it argues that GCC is not covered as an additional insured because it has not shown that the leak was caused by an act or omission of Mr. Simonelli; second, it contends that GCC cannot sustain its burden of showing that a gasoline leak of unknown origin is "an accident," and therefore a covered "occurrence" as defined by the policy.  In rebuttal, GCC relies on the Court's recent decision in <u>Optical Works & Logistics, LLC v. Sentinel Ins. Co., Ltd.</u>, Case No. 15-163-JJM-LDA, 2021 WL 928275 (D.R.I. Mar. 11, 2021) ("<u>OWL</u>"), which holds that "[w]hen an insurance company denies coverage and is defending against a breach of contract claim, it should be held to the reasons given to its insured in a denial letter and barred from introducing into evidence or arguing for any grounds that do not appear in the Denial Letter." <u>Id.</u> at *4.  This holding is grounded in the right of insureds "to rely on the facts and reasons given by the insurance company in the denial letter after it has thoroughly investigated the claim." <u>Id.</u>  To avoid <u>OWL</u>, Scottsdale asks this Court to reject it as wrongly decided.[10]

As to the "additional insured" problem, GCC is right that Scottsdale's Denial Letter failed to alert it to the position it is now taking – that despite being an additional insured, GCC is not covered in light of the policy language that limits the "additional insured's" coverage to losses caused by the "acts and omissions" of the primary insured, Mr. Simonelli.  ECF No. 18-1 at 106.  Mindful of the clarity of the finding above – that GCC's claim is precluded by the

---

[10] Because <u>OWL</u> was decided by a district judge different from the presiding district judge in this case, Scottsdale argues (correctly) that it is not controlling precedent.

¶ f(1)(a) Pollution Exclusion – I find that this case is not the appropriate vehicle for the Court to rethink OWL.  In any event, whether OWL applies or not, Scottsdale's motion for judgment based on the "additional insured" limitation should be denied.  That is, if the Court were to decide to consider OWL and reject its holding, permitting Scottsdale to assert the "additional insured" limiting language as an alternative reason for denying coverage, a fact finder could nevertheless conclude that the leaky gasoline tank was caused by the omissions of Mr. Simonelli, who undisputedly was responsible for overall maintenance of GCC's golf course.  DSUF ¶ 20.  Such a finding would permit GCC to recover as the "additional insured," making summary judgment in favor of Scottsdale inappropriate.

On the other hand, GCC is wrong about "occurrence" – the Denial Letter is not silent but expressly states Scottsdale's "concern" that GCC's claim did not trigger coverage because it did not arise from an "occurrence."  ECF No. 18-1 at 153.  It does not matter whether OWL is right or wrong because OWL does not bar Scottsdale from arguing this ground, which did appear in the Denial Letter.  OWL, 2021 WL 928275, at *4 (insurer "barred from introducing into evidence or arguing for any grounds that do not appear in the Denial Letter").  Faced with such an articulated "concern," GCC cannot sidestep its threshold burden to show that the gasoline leak was caused by an occurrence, defined as an "accident, including continuous or repeated exposure to substantially the same general harmful conditions."  ECF No. 18-1 at 104.  The real difficulty for Scottsdale, as the Denial Letter makes plain in describing the "occurrence" issue as a "concern," and not as the basis for denying the claim, is that whether this gasoline leak was an "occurrence" is an unsettled factual matter.[11]  Therefore, it is not appropriate for the entry of summary judgment in favor of Scottsdale.

---

[11] GCC points out that Scottsdale has never examined the leaky gasoline tank or investigated what happened.  PSUF ¶¶ 25-28, 33.  Therefore, it has no evidence to suggest that it was leaking due to intentional conduct by GCC or Mr.

Based on the foregoing, and without making any recommendation – one way or the other – about <u>OWL</u>, I recommend that the Court deny Scottsdale's motion for summary judgment to the extent that it is based on the limitation on coverage for GCC as the "additional insured" and on GCC's failure to establish an "occurrence."

## IV.   CONCLUSION

Based on the foregoing, I recommend that Scottsdale's motion for summary judgment (ECF No. 18) be granted in part and denied in part.  Specifically, I recommend that it be granted to the extent that the motion relies on the ¶ f(1)(a) Pollution Exclusion.  I recommend that it be denied to the extent that it is based on the coverage limitation applicable to GCC as an "additional insured" and on the alleged non-establishment of an "occurrence."  I further recommend that GCC's motion for summary judgment (ECF No. 19) be denied.  If the Court adopts these recommendations, judgment terminating the case should enter in favor of Scottsdale.

Any objection to this report and recommendation must be specific and must be served and filed with the Clerk of the Court within fourteen (14) days of its receipt.  <u>See</u> Fed. R. Civ. P. 72(b)(2); DRI LR Cv 72(d).  Failure to file specific objections in a timely manner constitutes waiver of the right to review by the district judge and the right to appeal the Court's decision.

---

Simonelli.  Since a gasoline tank should not leak, and intentional conduct by the insured has been ruled out, GCC contends that the circumstances permit a fact finder to draw the inference that the cause had to be an "accident," which the policy makes clear can be a continuing event as the evidence here establishes.  <u>See</u> <u>Perez v. Sears Life Ins. Co.</u>, 968 F. Supp. 2d 1192, 1197, 1202 (S.D. Fla. 2013) (despite lack of direct proof that decedent was victim of assault, court rejects insurer's argument that, without evidence of accident, there is no coverage; court finds dispute of material fact exists regarding whether accident occurred); <u>Tuttle v. Allstate Ins. Co.</u>, 138 P.3d 1107, 1111 (Wash. Ct. App. 2006) ("The ordinary meaning of an accidental loss is when [something] happens without design, intent, or obvious motivation.") (cleaned up); <u>cf.</u> <u>Cruz v. DaimlerChrysler Motors Corp.</u>, 66 A.3d 446, 452 (R.I. 2013) (negligence may be inferred by deployment of airbags without vehicle impact if other responsible causes have been eliminated).  I agree; GCC has enough to propel the question of whether there was an "occurrence" to a fact finder.

See United States v. Lugo Guerrero, 524 F.3d 5, 14 (1st Cir. 2008); Park Motor Mart, Inc. v.

Ford Motor Co., 616 F.2d 603, 605 (1st Cir. 1980).


/s/ Patricia A. Sullivan
PATRICIA A. SULLIVAN
United States Magistrate Judge
August 5, 2021